450 F.Supp. 1074 (1978)
KEWANEE MACHINERY DIVISION, CHROMALLOY AMERICAN CORPORATION, Plaintiff,
v.
LOCAL UNION NO. 21, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Defendant.
No. 77-366C(B).
United States District Court, E. D. Missouri, E. D.
May 9, 1978.
Angelo M. Pezzani, Lawrence W. Meyers, St. Louis, Mo., for plaintiff.
Barbeau A. Roy, St. Louis, Mo., for defendant.

MEMORANDUM
REGAN, District Judge.
This matter is before the Court on cross motions for summary judgment. The determinative facts are not in dispute.
*1075 The action was brought to vacate an arbitration award. We have jurisdiction under Section 185, 29 U.S.C. (Section 301, Labor Management Relations Act.)
The parties entered into a collective bargaining agreement, effective from June 8, 1974 to June 24, 1976, setting forth wages, hours, working conditions and a procedure to resolve disputes of plaintiff's employees who were represented by defendant. A similar agreement with no material changes was entered into for the ensuing two year period. The earlier agreement was in effect at the time the grievance arose.
On May 18, 1976, plaintiff terminated its employee, John R. Goesling, for violating plaintiff's posted plant rules on absences. He timely grieved his discharge, complaining that he was discharged "while sick and under a doctor's care" and requesting he be reinstated with no loss of wages or seniority. The grievance was duly processed through the grievance procedure, and when the parties were unable to resolve their differences, the controversy was submitted to arbitration, with James C. Duff being selected as arbitrator.
After a hearing on December 16, 1976, at which both parties appeared and were afforded the opportunity to present oral and documentary evidence and arguments in support of their respective positions, Arbitrator Duff made his written award on February 1, 1977. Thereby, Goesling's grievance was sustained and plaintiff was directed to reinstate him to his former position and pay him all wages and other contractual benefits lost by reason of his termination, less any wages or compensation received from other sources. This suit followed, plaintiff alleging that in making the award, Arbitrator Duff exceeded the scope of his authority under the collective bargaining agreement, in that he allegedly modified or altered its provisions and limited the rights of plaintiff which had been expressly set forth in the agreement.
Included in the collective bargaining agreement are the following provisions:
Article IVManagement
"Section 2  The Company retains the exclusive and unrestricted right to manage its business and its working forces, including but not limited to, the sole right to . . discipline . . . and discharge employees; exercise the unchallenged right to supervise; . . .
"Section 3  It is further agreed that any other management rights not otherwise limited by this contract are hereby reserved to the Company."
Article V  Cooperation
"Section 2  The Union recognizes the necessity of shop rules and regulations to provide a clean, safe, efficient and orderly shop and pledges its support in these common rules of good conduct."
Article XII  Seniority
"Section 3  Seniority shall be broken and all employment relations terminated when an employee . . . is discharged for proper cause . . . is absent from three consecutive scheduled shifts without notification to the Company . . . is absent from any eight scheduled shifts in a calendar year without prior notification to the Company. When an employee is so absent, the Company will send the employee a warning letter with a copy to the Local Union."
"Section 5  No employee shall lose seniority for time off due to illness . .."
It appears from the Arbitrator's statement of facts that in the fall of 1974, by reason of plaintiff's concern over the problem of repeated absences and tardiness, plaintiff unilaterally promulgated and posted the following notice setting forth its attendance policy:
"NOTICE
Due to the excessive tardiness and frequent or repetitious absence by a few employees, the company is setting the following standards effective Monday, Feb. 3, 1975.
(1) Any tardiness or unexcused absence in excess of two each per month is grounds for disciplinary action.

*1076 (2) Any employee that averages being tardy more than twice or absent more than twice per month over a six month period will be subject to dismissal.
(3) Repetitious absence will no longer be tolerated, no matter what the excuse.
These standards will prove to be no hardship to the large percentage of our employees. I hope the few people causing the problems will cooperate and the above standards can be relaxed."
There is no contention that Goesling and the other employees were not aware of the foregoing policy. The policy is applied by the Company automatically on a per se basis. That is, without regard to the reason triggering an absence, whether it be for illness or mere personal convenience, the Company looked only to whether the employee is in fact absent or tardy on more than two occasions in a single month. As thus applied, however, absences on any number of consecutive days in a single month were considered as a single absence.
Plaintiff's foregoing attendance policy was enforced in a four step process starting with an initial written warning to the employee, followed by a second written warning, then a three day disciplinary suspension, and finally, discharge. This policy was followed in the discharge of Goesling and also as to two other employees whose discharges were "accepted" by the Union without contest because of the specific circumstances involved in those cases. Goesling's first warning (for tardiness) was received in January, 1976, his second warning notice (for absences) on March 6, 1976, and his three day disciplinary lay off (for absence and another incident) on March 15, 1976. Then, when Goesling's absences in May, 1976, exceeded the "two occasion" per month standard established by the Company policy, he was terminated.
It is now well settled that an arbitrator's award "is legitimate only so long as it draws its essence from the collective bargaining agreement." United Steelworkers of America v. Enterprise Wheel and Car Corp. (1960), 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424. That is, the arbitrator "is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice." ibid. On the other hand, once it is determined that the arbitrator has acted within the limits of the authority granted to him by the collective bargaining contract, the courts may not review the merits of his decision. Steelworkers v. American Mfg. Co. (1960), 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403.
As concerns the extent of the arbitrator's authority, Article XI, Section 7, of the contract provides that "the arbitrator must render a decision within the scope and terms of this agreement and only on interpretation and application of the provisions herein. It is agreed that the arbitrator shall not add to or subtract from, alter or modify any provisions of this agreement. Further, the arbitrator may not limit or restrict management rights not limited or waived by specific sections of this agreement."
The arbitrator's award specifically finds:
"There can be no question that the Company has the right to establish, maintain and enforce reasonable rules and regulations to assure orderly plant operations. Absenteeism constitutes a notoriously serious problem in American industry, and the Company has demonstrated that Grievant's irregular attendance[1]had a significant adverse effect on its production and shipments since Mr. Goesling was one of only ten welders on his shift . . . . Even where an employee's repeated absences are due to bona fide illness, an employer may have good cause to terminate an employee as a necessary incident of its power to engage in competitive enterprise in a manner which insures economic survival . ."
*1077 Nevertheless the arbitrator concluded that absences due to illness should be treated differently than absences not so triggered, and that the Company's "(f)ailure to distinguish between legitimate excuses for absences and reprehensible misconduct is repugnant to fundamental notions of fair play whenever it results in an employee whose absence is for legitimate reasons beyond his control being treated as harshly as a deliberate wrongdoer."
Turning to "the specific facts of this case," the arbitrator acknowledged that the "employer's absentee control program is excessively liberal," but "is tainted by the fact that discipline is automatically triggered by further `occasions,' without regard to the cause of any of the absences," and then held that since Goesling's absence of May 18, 1976 was "the immediate predicate for his discharge under the Company's absentee control policy . . . the Company's failure to consider Grievant's illness on that date before imposing disciplinary action was unjust."[2] He then concluded that "the Grievant's discharge was a penalty which was not based on any established form of misconduct," and so must be rescinded.
What the arbitrator held, in essence, was that if an employee's absences, and particularly the last one, are deliberate, that amounts to misconduct which should subject the employee to disciplinary action including dismissal, but that an employee's termination based on his absences due to bona fide illness "is not disciplinary in nature," and therefore it is "unjust" to impose "disciplinary" action on the employee.
It is thus evident that the arbitrator "interpreted" the contract as precluding discharge except for "misconduct" meriting discipline. In so doing, he thereby modified and amended the collective bargaining agreement. As noted supra, the agreement provided that the employer retained "the exclusive and unrestricted right to manage . . . its working forces, including but not limited to, the sole right to discipline . . . and discharge employees." Thus, the contract itself differentiates between discipline and discharge and reserves the rights with respect to both as exclusive and unrestricted management prerogatives. In addition, the company also reserved to itself any other management rights "not otherwise limited" by the contract. Emphasizing this retention of management rights is the provision in Article XI, Section 7, which not only precludes the arbitrator from exercising any authority to add to or subtract from, alter or modify any provisions of the agreement, but expressly states that he "may not limit or restrict management rights not limited or waived by specific sections" of the agreement.
It is true that Article XII, Section 3, relating to seniority uses the term "discharged for proper cause" ("Seniority shall be broken and all employment relations terminated when an employee . . . is discharged for proper cause"). And it is on this thin reed that the Union bases its contention that the arbitrator was not usurping management rights by determining that Goesling's discharge was "unjust." Even if it be assumed that the oblique reference to "proper" cause could be interpreted as limiting management's rights, the fact is it does not specifically so state as required by Section 7 of Article XI. And, more importantly, the arbitrator does not base his decision on any interpretation of the term "proper cause" as used in the contract, but instead emphasizes his feeling that termination for illness is "patently unfair," "repugnant to fundamental notions of fair play," "unjust," evidences "callous indifference to the underlying circumstances," and "constitutes a penalty which was not based on any established form of misconduct."
*1078 The arbitrator having found that absenteeism is a "proper" cause for terminating an employee, and in particular that Goesling's "irregular attendance had a significant adverse impact" on the Company's production and shipments, that should have been the end of the matter. Instead, the arbitrator focused not on the "cause" for the termination (absenteeism) which was a proper cause for discharge, but on the alleged cause for Goesling's last absence, thereby altering the contract and limiting the Company's right to discharge employees only as a disciplinary measure for "misconduct."
The mere fact that the employer declined to consider the explanations offered by Goesling for his May 18, 1976 absence does not warrant the conclusion that he was terminated for being ill on that date. "No amount of circumlocution" can alter the obvious fact that Goesling was discharged for the totality of his absenteeism. His own conduct and pattern of attendance placed him in peril of discharge. As noted supra, an arbitrator "does not sit to dispense his own brand of industrial justice." Nothing in the contract warranted the Arbitrator in holding, in effect, that although absenteeism is a "proper" cause for discharge, "fundamental notions of fair play" did not permit the Company to exercise its management prerogatives where to do so might result in an unjust result in a particular instance.
It follows that defendant's motion for summary judgment should be and it is hereby OVERRULED, and that Plaintiff's motion for summary judgment should be and it is hereby SUSTAINED. Judgment will be entered vacating the arbitrator's award.
NOTES
[1] It is undisputed that in the four and a half month period from January 1, 1976 until his May 18, 1976 discharge, Goesling was absent during his scheduled working hours a total of 175¾ hours.
[2] Significantly, the arbitrator made no express finding that Goesling was in fact sick to the extent he was precluded from working on May 18, 1976. Several times in the course of his award, the arbitrator clearly indicated that he was making no such finding. For example, "the Grievant and the Union on his behalf maintain that he cannot properly be fired for being sick, as he allegedly was on May 18, 1976." And again, "there is not the slightest suggestion that any number of warnings would have enabled Grievant to ward off the genuine sickness he allegedly experienced on May 18, 1976."